AMERICAN BUS ASSOCIATION,
Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Maislin Transport Ltd., et al., Sanborn's Motor Express, Inc., Intervenors.

REGULAR COMMON CARRIER CONFERENCE, et al., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Chemical Leaman Tank Lines, Inc., Butler Trucking Company, Maislin Transport Ltd., et al., Sanborn's Motor Express, Inc., Intervenors.

Nos. 79–1207, 79–1214.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 8, 1980.

Decided June 25, 1980.

Patrick McEligot, Washington, D. C., with whom Charles A. Webb, Washington, D. C., was on the brief, for petitioners. Patrick McEligot, Washington, D. C., also entered an appearance for Intervenor, Maislin Transport, Ltd., et al.

Evelyn G. Kitay, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I. C. C., and Robert Lewis Thompson, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

William H. Shawn, Washington, D. C., for intervenors, Butler Trucking Co., and Chemical Leaman Tank Lines, Inc., in No. 79–1214.

Before McGOWAN, ROBB and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

We here review a pronouncement by the Interstate Commerce Commission which was intended to lessen the constraints placed upon motor carriers seeking authority to transport goods and people to and from Canada. In promulgating this pronouncement, the Commission did not follow the notice-and-comment procedures which section 553 of the Administrative Procedure Act prescribes for rule-making. The Commission contends that its action was, as distinct from a substantive rule, a "general statement of policy" as defined in section 553(b)(A), and that such procedures were therefore unnecessary. Because we conclude that the requirements of section 553 were applicable and were not met, we hold unlawful and set aside the statement.

I

On December 5, 1974, the Interstate Commerce Commission published notice in the Federal Register that, beginning March 3, 1975, it would apply the following policies to applicants wishing to provide motor carrier transportation to and from Canada:

(1) With respect to applications relating to traffic moving to or from Canada, we shall expect applicants to specify the Canadian points and port of entry points involved in this service, and grants of authority will be specifically limited accordingly.

(2) Where a Canadian carrier seeks single-line service authority for traffic moving to or from Canadian points, American protestants will be expected to show that they possess the necessary Canadian authority or are effectively competing for the involved traffic in an existing joint-line service.

(3) Any applicant seeking authority for a single-line service involving traffic moving to or from Canada must indicate that it holds the necessary Canadian authority or a condition will be imposed on a grant requiring the obtaining of such Canadian authority prior to issuance of the certificates.

Subsequently, the Commission became dissatisfied with these policies and, on February 8, 1978, voted to attach a "Note" to any authority involving Canadian traffic. The Note read:

The restrictions and conditions contained in the grant of authority in this proceeding are phrased in accordance with the policy statement entitled Notice to Interested Parties of New Requirements Concerning Applications for Operating Authority to Handle Traffic to and from points in Canada published in the Federal Register on December 5, 1974 and supplemented on November 18, 1975. The Commission is presently considering whether the policy statement should be modified, and is in communication with appropriate officials of the provinces of Alberta, Sas-

katchewan, and Manitoba regarding this issue. If the policy statement is changed, appropriate notice will appear in the Federal Register and the Commission will consider all restrictions or conditions which were imposed pursuant to the prior policy statement, regardless of when the condition or restriction was imposed, as being null and void and having no force or effect.

J.A. 17.

On December 14, 1978, after meeting with Canadian provincial officials, but without giving public notice or soliciting public comment, the Commission adopted the policy statement here at issue. That statement, entitled "Revised Policy Concerning Applications for Operating Authority to Handle Traffic to and from Points in Canada," was published in the Federal Register on December 28, 1978, and provided:

(1) With respect to applications relating to traffic moving to or from points in Canada, the Commission will no longer restrict grants of authority to specific Canadian destinations or origins, or designate specific port of entry points which must be used.

(2) Carriers protesting applications for traffic moving to or from Canadian points are not required to show that they possess the necessary Canadian authority but are expected to comply with the requirements in Ex Parte No. 55 (Sub-No. 26), *Protest Standards in Motor Carrier Application Proceedings*, decided October 10, 1978.

(3) Applicants no longer need submit copies of Canadian authority and the Commission will not require a showing of complementary Canadian authority prior to the issuance of a certificate.

43 Fed.Reg. 60706.

In discussing provision (1), the Commission announced, "New certificates deleting the restrictions imposed pursuant to the prior policy (those issued pursuant to applications filed subsequent to March 3, 1975) will not be issued. Instead, those restrictions will be considered null and void and

will be given no force or effect." *Id.* The Commission warned, however, that "[c]arriers holding authorities issued prior to the effective date of the earlier policy statement are reminded that similar restrictions contained in their authorities are still valid and enforceable." *Id.*

As to provision (3), the Commission said, "All carriers now holding grants of authority conditioned solely on a showing of complementary Canadian authority should inform the Commission in writing and request immediate issuance of their certificates or permits." *Id.* at 60707 (footnote omitted).

Commissioner Stafford dissented. He objected to the Commission's failure to solicit the views of affected parties. Apparently speaking of foreign origin and destination restrictions, he also said:

[T]he restriction removed by this policy statement was imposed because of an express or implicit finding in each case that the public convenience and necessity did not warrant a broader grant of authority. . . . Elimination of these restrictions from outstanding certificates broadens the scope of authority, and cannot legally be effected without appropriate findings. At a minimum, general licensing would appear to be required.

*Id.*

Two trade associations of carriers—the American Bus Association and the Regular Common Carrier Conference—and a number of individual motor carriers now seek judicial review of the Commission's statement. Two motor carriers have intervened in support of respondents, who are the Commission and the United States of America.

II

The gist of petitioners' argument seems to be that the Commission's "policy statement" was not lawfully promulgated because the Commission failed to comply with section 553 of the Administrative Procedure

Act (APA).[1] Section 553 requires that, when an agency proposes to issue a rule, it must first (1) publish a general notice in the Federal Register, (2) "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and (3) "incorporate in the rules adopted a concise general statement of their basis and purpose."

Nevertheless, Congress anticipated that there would be times when "the policies promoted by public participation in rule-making are outweighed by the countervailing considerations of effectiveness, efficiency, expedition and reduction in expense." *Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp.,* 589 F.2d 658, 662 (D.C. Cir. 1978). Therefore, in section 553(b)(A) of the APA Congress excepted "general statements of policy" from the requirements of section 553. Respondents argue that the statement under review falls within that exception.

In order to test respondents' argument, we must first understand the scope and significance of the principle from which they wish to be excepted. Section 553 was one of Congress's most effective and enduring solutions to the central dilemma it encountered in writing the APA—reconciling the agencies' need to perform effectively with the necessity that "the law must provide that the governors shall be governed and the regulators shall be regulated, if our present form of government is to endure." S. Doc. No. 248, 79th Cong., 2d Sess. 244 (1946), *quoting* H.R.Rep. No. 1149, 76th Cong., 1st Sess. 2 (1939). The "principal purpose" of section 553 was "to provide that the legislative functions of administrative agencies shall so far as possible be exercised only upon public participation on notice . . . ." *Id.* at 257. Congress thus selected public participation in rule-making as

its means of assuring that an agency's decisions are both informed and responsive. As we have said before, "if the Agency, in carrying out its 'essentially legislative task,' has infused the administrative process with the degree of openness, explanation, and participatory democracy required by the APA, it will thereby have 'negate[d] the dangers of arbitrariness and irrationality in the formulation of rules . . . .'" *Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1027–28 (D.C. Cir. 1978).

We do not, of course, doubt that agencies may bypass section 553's requirements when genuinely acting within the scope of the few specified exceptions to it. However, Congress was alert to the possibility that these exceptions might, if broadly defined and indiscriminately used, defeat the section's purpose. Thus the legislative history of the section is scattered with warnings that various of the exceptions are not to be used to escape the requirements of section 553. *See, e. g.,* S. Doc. No. 248, 79th Cong., 2d Sess. 19, 199, 258 (1946).[2] *See National Wildlife Federation v. Snow,* 561 F.2d 227, 232 (D.C. Cir. 1976). Further, the Senate Committee responsible for considering the APA concluded its report by investing courts with a "duty . . . to prevent avoidance of the requirements of the bill by any manner or form of indirection . . . ." *Supra,* 79 Cong., 2d Sess. 19, at 217. In sum, as this court said in *Humana of South Carolina v. Califano,* 590 F.2d 1070, 1082 (D.C. Cir. 1978), "The salutary effect of the Act's public comment procedures cannot be gainsaid, so only reluctantly should courts recognize exemptions therefrom."

With the foregoing in mind, we begin our inquiry into the nature of a "general statement of policy." The inquiry is a hazardous

---

1. Because we sustain petitioners' interpretation of section 553, we do not need to reach their contentions that the statement fails for lack of an adequate explanation, for want of a finding of public convenience and necessity, or for failure to meet the standards of 5 U.S.C. § 706.

2. The exception for "general statements of policy" is not one of the exceptions as to which

Congress issued such a warning. That exception is in fact virtually undiscussed in the legislative history. It therefore seems likely that Congress did not anticipate that the exception would loom large in the application of section 553, and we may reasonably assume that it is not to be granted a more generous reading than the other exceptions.

one, since, as courts and commentators agree, "the distinction between a rule as defined in section 551(4), which must be published, and a 'general statement of policy,' which is not defined in the Act, is enshrouded in considerable smog . . ." *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975).[3]

Because the term "general statement of policy" is defined neither in the Act nor its legislative history, we turn to the definition proffered in the *Attorney General's Manual on the Administrative Procedure Act* (1947), "a contemporaneous interpretation previously given some deference by [the Supreme] Court because of the role played by the Department of Justice in drafting the legislation . . . ." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 546, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978). That document's only discussion of our problem occurs in a footnote which defines general statements of policy as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." Attorney General's Manual at 30 n. 3. While this definition is not free from ambiguity, it does convey what this court has identified as a basic, defining characteristic of a policy statement:

> A general statement of policy . . . does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy. A policy statement announces the agency's tentative intentions for the future.

*Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974) (footnote omitted).

■ In deciding whether an agency's pronouncement is a policy statement or is in fact a "binding norm," courts have employed two criteria. First, courts have said that, unless a pronouncement acts prospectively, it is a binding norm. Thus the Attorney General's Manual speaks of an agency's *prospective* advice, a thought the Third Circuit amplified when it explained that a statement of policy may not have a present effect: "a 'general statement of policy' is one that does not impose any rights and obligations on an operator . . . ." *Texaco v. FPC*, 412 F.2d 740, 744 (3d Cir. 1969). This first criterion was used in both of this Circuit's two leading cases on the "general statements of policy" exception. *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (1974); *Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978).

The second criterion is whether a purported policy statement genuinely leaves the agency and its decision-makers free to exercise discretion. A purported policy statement which did not do so could not be an "announce[ment of] the general policy which the Commission hopes to establish in subsequent proceedings," *Pacific Gas*, 506 F.2d at 41, but would, impermissibly, be a "binding norm." This second criterion is most plainly enunciated in Judge Leventhal's opinion in *Guardian Federal*:

> A general statement of policy that has not been issued under section 553 as a binding rule must leave the administrator free to exercise his informed discretion
>
> · · · ·
>
> . . . If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is—a binding rule of substantive law.

589 F.2d at 666–67.

The second criterion cannot, of course, be applied mechanically. As Judge Leventhal

**3.** "[T]he problem is baffling. The statute is not clear, and its legislative history helps hardly at all." 2 K. Davis, Administrative Law Treatise 32 (2d ed. 1979). "Assertions to the effect that 'the term "statement of policy" can be quite elusive' seem well founded." Bonfield, *Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy Under the A.P.A.*, 23 Ad. L.Rev. 101, 113 (1971).

commented, "A matter of judgment is involved in distinguishing between rules, however discretionary in form, that effectively circumscribe administrative choice, and rules that contemplate that the administrator will exercise an informed discretion in the various cases that arise." *Id.* at 667. In undertaking that judgment, courts have scrutinized the language of the purported statement and the circumstances of its promulgation. Thus in *Guardian Federal* the court studied the language of the challenged regulation, which read:

> The Chief Examiner shall determine whether an auditor is satisfactory to [the Federal Savings and Loan Insurance Corp.], whether an audit was conducted in a manner satisfactory to [FSLIC], and whether a report of audit is to be accepted. If at any time, it is found that [specified circumstances obtain] . . ., the Chief Examiner *may* reject the audit.

*Id.* at 666 (emphasis provided by the court in *Guardian Federal*). Observing that "the Chief Examiner has discretion to accept a non-conforming audit report," the court held the regulation to be a "general statement of policy." *Id.*

The Court in *Pacific Gas* similarly examined the language of the challenged order before agreeing that a purported policy statement was a true policy statement. The court noted the order's pervasively tentative language and pointed out that

> the Commission announced in Order No. 467 the curtailment policy which it "proposes to implement," the "plan preferred by the Commission," which "will serve as a guide in other proceedings." . . . Thus, the stated purpose of Order No. 467 was not to provide an inflexible, binding rule but to give advance notice of the general policy with respect to curtailment priorities that the Commission prefers.

506 F.2d at 40. In addition, the court relied on the agency's careful and explicit notice in the order that, in any subsequent proceedings, the agency would "thoroughly consider not only the policy's applicability to the facts of a given case but also the underlying validity of the policy itself."[4] *Id.* at 39.

In applying the second criterion in *Pickus v. U. S. Board of Parole*, 507 F.2d 1107 (D.C. Cir. 1974), we took into account the language, structure, and calculable effect of the statement. The Parole Board claimed that guidelines specifying many of the factors it used in deciding whether to parole prisoners were "general statements of policy." The court disagreed, on the grounds that those guidelines

> were of a kind calculated to have a substantial effect on ultimate parole decisions. . . . Although they provide no formula for parole determination, they cannot help but focus the decisionmaker's attention on the Board-approved criteria. They thus narrow his field of vision, minimizing the influence of other factors and encouraging decisive reliance upon factors whose significance might have been differently articulated had Section 4 [now section 553 of the APA] been followed.

*Id.* at 1112–13. In sum, the court held, the guidelines "are substantive agency action, for they define a fairly tight framework to circumscribe the Board's statutorily broad power." *Id.* at 1113.

We conclude our discussion of the second criterion with a lesson drawn from the Supreme Court's decision in *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). That case was, of course, decided before the APA was enacted, and the issue in it was whether a pronouncement of the Federal Communications Commission was an order—*i. e.*, a final determination of the agency—and therefore reviewable under section 402(a) of the Communications Act of 1934. Thus, we do not wish to exaggerate the case's relevance. Nevertheless, the Court's reasoning in *CBS* sheds confirmatory light

---

4. The order said:

> When applied in specific cases, opportunity will be afforded interested parties to challenge or support this policy through factual or legal presentation as may be appropriate in the circumstances presented.

> *Quoted in* 506 F.2d at 40.

on our description of the APA's general statement of policy. *Pacific Gas,* 506 F.2d at 42 n. 25.

The FCC's regulation in *CBS* arguably required the FCC to refuse to license any station having certain kinds of contractual relations with a broadcast network. In promulgating the regulation, the FCC expressly called it "nothing more than the expression of the general policy we will follow in exercising our licensing power." *Quoted in* 316 U.S. at 432, 62 S.Ct. at 1207. And the FCC expressly preserved the right of a station "to contest the validity of the . . . Regulations . . ., or the reasonableness of their application to the particular station . . .." *Quoted id.* at 433, 62 S.Ct. at 1207. Adverting to these facts, Justice Frankfurter wrote a minority opinion which argued, with some vehemence, that the regulation was a policy statement and not an "order":

> In promulgating these regulations the Communications Commission merely announced its conception of one aspect of the public interest, namely, the relationship of certain provisions in network-affiliation contracts to the obligation of a station licensee to render the most effective service to the listening public. The regulations themselves determine no rights. They alter the status of neither the networks nor licensees. . . . They are merely an announcement to the public of what the Commission intends to do in passing upon future applications for station licenses.

*Id.* at 430–31, 62 S.Ct. at 1206–07.

The majority, however, speaking in terms relevant to our problem, looked not only to the form, but to the language and probable effect of the regulation:

> When, as here, the regulations are avowedly adopted in the exercise of [the administrative rule-making] power, *couched in terms of command and accompanied by an announcement of the Commission that the policy is one "which we will follow in exercising our licensing power,"* they must be taken by those entitled to rely upon them as what they pur-

ported to be—an exercise of the delegated legislative power—which, until amended, are controlling alike upon the Commission and all others whose rights may be affected by the Commission's execution of them.

*Id.* at 422, 62 S.Ct. at 1202 (emphasis added).

### III

We turn now to the reasons the Commission's pronouncement does not fit this court's definition of a "general statement of policy," and so falls outside section 553(b)(A)'s exception to section 553's notice-and-comment requirements. Applying our first criterion, we find that the Commission's pronouncement does not, as a policy statement must, operate only prospectively; in at least two respects it is "finally determinative of the issues or rights to which it is addressed." First, the statement declares flatly that, as to certificates granted after March 3, 1975, the restrictions specified in its provision (1) "will be considered null and void and will be given no force or effect." The clear purport of this emphatic statement is that, without further action by the Commission and effective immediately, restrictions previously imposed on carriers' freedom have been lifted. Second, in expounding provision (3) the statement provides that carriers with "grants of authority conditioned solely on a showing of complementary Canadian authority" should "request immediate issuance of their certificates." 43 Fed.Reg. at 60707. This clearly implies that the "immediate issuance" is to be automatic, and that it is a formality implementing the Commission's previously made decision that such certificates have become effective. In short, the pronouncement wholly fails to fit our first criterion of a policy statement.

The pronouncement likewise fails to meet the terms of our second criterion, in that it is not "simply a general pronouncement of the broad policy considerations which will motivate the Commission as it addresses itself to its appointed tasks," *National Motor Freight Traffic Association v. United*

*States*, 268 F.Supp. 90, 96 (D.D.C.1967) (three-judge court), but rather "is in reality a flat rule of eligibility." *United States ex rel. Parco v. Morris*, 426 F.Supp. 976, 984 (E.D.Pa.1977).

We look first to the statement's language, and find that nothing in it even hints to those who will apply the statement that they may exercise any discretion in doing so. Instead of "announc[ing] the agency's tentative intentions," the statement is unequivocally "couched in terms of command." *Pacific Gas*, 506 F.2d at 38, 42. It repeatedly says and implies "the Commission *will* "; it nowhere says or implies "the Commission *may*." Rather, each provision of the statement purports on its face to notify applicants for certificates precisely what showings the Commission will or will not require of them. Further, the Commission speaks of and clearly believes it has accomplished "the elimination of [the Canadian] restrictions." In short, the statement's "likely effect" is not simply to limit administrative discretion, but to abolish it.

Two other considerations confirm our conclusion that the pronouncement's language prescribes a "binding norm." First, intertwined with that language are determinations of present rights and obligations which, as we showed in our discussion of the first criterion, are inconsistent with the tentative nature of a policy statement. Courts, Commission review boards, and interested parties reading the controverted pronouncement can reasonably infer from this promiscuous intermingling that the agency intends that the statement's language be no less binding than its determinations.

Second, two Commission cases further indicate that the Commission itself regards the policy statement as binding. In *Frederick Transport Limited, Extension—Three States*, No. MC–116519 (Sub-No. 48) F, slip op. at 1 (Aug. 3, 1979), Division 2 of the Commission said approvingly, "the policy statement properly was relied upon to justi-

fy removal of the Canadian origin and destination restrictions imposed by the review board." And in *Redbird Development, Inc., Contract Carrier Application*, No. MC–145243 (Sub-No. 1) F, slip op. at 2 (Dec. 19, 1979), Review Board Number 1 said that the policy statement "provides that the Commission will no longer restrict grants of authority to specific Canadian destinations or origins. Consequently, we will not so restrict our grant." In short, the Commission could hardly be in plainer violation of our decision in *Pacific Gas* that "[t]he agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy." 506 F.2d at 38.

Respondents point out that, in *Frederick Transport*, Division 2 of the Commission stated, "[U]pon further reflection we now believe that the policy statement should not have been applied to justify deletion of the designated port of entry points, and that the authorization should be limited to those ports of entry specified in the original application . . . ." [5] Slip op. at 1–2. Respondents appear to argue that *Frederick Transport* demonstrates that the policy statement does not finally determine the rights of carriers. However, the quoted sentence is the only discussion of the port-of-entry problem in *Frederick Transport*, and the Division never purports, as respondents suggest, to be "apply[ing] the policy statement to particular factual situations." Thus the Division's Delphic utterance may perhaps be best understood as an attempt to retract a portion of the policy statement. This was certainly the conclusion of the Commission's own review board in *Redbird* :

> [T]he Commission, upon further reflection, now believes that the policy statement should not be applied to delete designated ports of entry, see . . . *Frederick Transport* . . . . Consequently, we have specified ports of entry in our grant.

---

**5.** Division 2 consisted of Commissioners Stafford, O'Neal, and Christian. Commissioner Stafford was the Commission member who dis-

sented from the original issuance of the policy statement.

Slip op. at 2. In any event, this single case can hardly counterbalance the considerable evidence adduced above indicating that the pronouncement is not a policy statement.

The reasoning described in the preceding paragraphs leads us to conclude that the Commission's statement lies far wide of the boundary of a "general statement of policy." Respondents seek to rebut this reasoning, at least as it applies to provision (1),[6] but the nature of that rebuttal is not easily divined.[7] Respondents apparently believe that the changes worked by the Commission's statement are so insubstantial that they are "more form than substance." Oral Argument, Transcript at 17, 24, 33. Respondents urge this argument in respect to both of the kinds of Canadian restrictions removed by provision (1).

As to restrictions on origins and destinations, respondents say:

> [I]t is true that the Commission will no longer insert these on certificates, but the carrier still has to have authority from the Canadians, which he always had to have before, so that really there is no substantial change being made.

Oral Argument, Transcript at 18.

As to port-of-entry designations, respondents argue:

> Whether or not the Commission removes the requirement that carriers designate specific ports of entry, service can only be provided if a carrier applies for and receives authority to operate between a particular border point or points and specific origins and destinations within the United States.

Respondents' Supplemental Memorandum at 3.

It may be true that practical considerations hampered the Commission's ability to enforce the Canadian restrictions and will diminish the effects of lifting those restrictions. However, respondents nowhere contend that the Canadian restrictions did not impose legally enforceable duties and constraints on shippers. On the contrary, the very *raison d'être* of the Commission's statement is that those duties and constraints were unjustifiably onerous. Thus, whatever the precise nature of those duties may have been, our general and sufficient answer to respondents' rebuttal argument is that the Commission cannot use a policy statement to release shippers from them.

## IV

Respondents' pronouncement might well be thought to illustrate the general desirability of the rule-making procedures section 553 prescribes, for the pronouncement creates a scheme whose rationality is difficult to discern. The scheme establishes three classes of certificate holders: (1) those who received certificates before March 3, 1975, and whose certificates therefore retain any restrictions they may originally have had; (2) those who received certificates on or after March 3, 1975, but before *Frederick Transport* was decided, and whose certificates therefore contain none of the Canadian restrictions here at issue; and (3) those who received certificates after *Frederick Transport*, whose certificates may or may not contain Canadian restrictions, depending on whether Division 2's decision in that case has binding effect. Had the Commission undertaken notice-and-comment rule-making and prepared the statement of basis for purpose which must accompany it, a more rationale scheme might have been devised, or, at least, a more intelligible explanation of the present scheme might have been provided. We thus repeat our closing admonition in *Guardian Federal*:

> There is increasing recognition that opportunity for outside comment does enhance perspective, and has benefits that typically outweigh modest impediments

6. Respondents may have limited their rebuttal to provision (1) because they believed that petitioners attack only that provision. However, if, as we believe, petitioners' argument is that the Commission improperly ignored the notice-and-comment requirements of section 553, that argument logically applies to the statement as whole, as we have demonstrated.

7. We have carefully examined intervenors' arguments in support of the Commission's statement and find them to be without merit.

534

to administration. An agency [which employed notice-and-comment rule-making] would acquire the additional advantage of avoiding both litigation and the risk of upset by a court taking a different view of the requirements for notice and comment.

589 F.2d at 669.

## V

For the reasons above stated, we hold unlawful and set aside the Commission's statement of December 28, 1978.[8]

---

8. Provision (2) of the statement notes that protestants "are expected to comply with the requirements in Ex Parte No. 55. . . ." As this court held in *American Trucking Associations, Inc. v. U. S.*, No. 78–2260 (April 24, 1980), the protest standards established in that proceeding are properly promulgated and binding rules; the fact that the statement here under review acknowledges the applicability of Ex Parte No. 55's requirements cannot and does not exempt carriers protesting applications for Canadian traffic from those requirements.