**PATRIOT, INC. et al., Plaintiffs,**

v.

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al., Defendants.**

Civil Action No. 97–0586 (HHG).

United States District Court, District of Columbia.

April 11, 1997.

Jed L. Babbin, Tighe, Patton, Tabackman & Babbin, Washington, DC, Sharon L. Babbin, Hillyer & Irwin, Washington, DC, for plaintiffs.

Benjamin R. Barnett, Asst. U.S. Atty., Washington, DC, for Federal Defendants; Jamir R. Couch, Special Asst. to. Gen. Counsel, Carole W. Wilson, Associate Gen. Counsel for Lit. and Fair Housing Enforcement, Angelo Aiosa, Asst. Gen. Counsel for Lit., Stephen I. Shaw, Trial Atty., of counsel.

Andrew T. Karron, M. Sean. Laane, Michael Le Desma, Arnold & Porter, Washington, DC, for Fannie Mae.

Deborah M. Zuckerman, Michael R. Schuster, American Association of Retired Persons, Washington, DC, for Amicus Curiae American Association of Retired Persons.

### MEMORANDUM and ORDER

HAROLD H. GREENE, District Judge.

Before the Court is plaintiffs' motion for a preliminary injunction, defendants' opposition, plaintiffs' reply thereto, and a motion to dismiss filed by the Federal National Mortgage Association ("Fannie Mae").

Patriot, Inc., and America's Trust, two estate and financial planning services from California, challenge certain actions of officials at the Department of Housing and Urban Development ("HUD") and at Fannie Mae. More specifically, they challenge the March 17, 1997 announcement by Assistant Secretary of HUD Nicholas Retsinas that the Federal Housing Administration ("FHA") will no longer insure Home Equity Conversion Mortgages ("reverse mortgages") obtained with the assistance of services such as plaintiffs'

### I

The reverse mortgage program was established by Congress in 1988 to enable elderly homeowners to convert equity in their homes into a supplemental income stream. 12 U.S.C. § 1715z–20(a). A reverse mortgage is aptly named; instead of the mortgagor (homeowner) making payments to the mortgagee (lender), the mortgagee makes payments to the mortgagor.

Patriot provides information on and assistance in obtaining reverse mortgages, and refers clients to an FHA-approved lender to apply for such a loan. When the processing of the loan is completed, Patriot collects a fee for its services, typically 8.5% of the amount of the loan. HUD's role is insuring the reverse mortgage transactions of FHA-approved lenders. After being processed by a lender, the loans are funded by a private company, either TransAmerica HomeFirst, Inc., or Wendover Funding, Inc. Fannie Mae then repurchases the loans from TransAmerica or Wendover.

From September 1, 1996, until the March 17 announcement, HUD issued, and Fannie Mae repurchased, approximately 115 reverse mortgage loans per month which were obtained through referrals by plaintiffs. At least in part to respond to concerns raised by the American Association of Retired Persons ("AARP") (a recent entrant in the business of marketing variable annuities to seniors through a joint venture with Hartford Life), HUD came to the conclusion that the fees charged by Patriot were too high. The HUD announcement, issued in the form of a press release and "Mortgagee Letter," effectively blocked 279 pending loans referred by Patriot, and denied plaintiffs the ability to be reimbursed for their services on the pending

loans. The Mortgagee Letter was not addressed to Fannie Mae, nor did it order Fannie Mae to cease purchasing reverse mortgages procured by Patriot.

Plaintiffs argue that the Mortgagee Letter constitutes administrative rulemaking for which HUD has not undertaken the notice and comment procedures required under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and that, in refusing to repurchase the loans referred by plaintiffs, Fannie Mae violated an implied contract with plaintiffs and breached its obligation of dealing in good faith with the public.

On March 26, 1997, after a hearing on plaintiffs' motion for a temporary restraining order and upon consideration of plaintiffs' motion,[1] the Court granted the motion, temporarily enjoined HUD from implementing or enforcing the terms of the March 17 Mortgagee Letter, and enjoined Fannie Mae from refusing to repurchase reverse mortgage loans issued by HUD and obtained through the assistance of plaintiffs.

## II

A preliminary injunction will be granted if the plaintiffs demonstrate: (1) a substantial likelihood of success on the merits; (2) that they would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not substantially injure other parties; and (4) that the public interest favors entry of a preliminary injunction. *CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995). The Court finds that plaintiffs have satisfied this rigorous test as to defendant HUD, but not as to defendant Fannie Mae.

As a preliminary matter, the Court addresses HUD's challenge to the plaintiffs' standing. HUD argues that plaintiffs are outside the zone of interest sought to be protected by the relevant statute, 12 U.S.C. § 1715z. As an entity which brings together lenders and elderly homeowners with limited income, plaintiffs' services fall within the pur-

pose of this statute, which is to encourage elderly homeowners to obtain such reverse mortgages where necessary and to encourage mortgagees to participate in the program. In the alternative, HUD argues that the actions of HUD were not directed at Patriot, but at HUD's insured lenders. In reality, the Letter could not be more directly aimed at plaintiffs; it specifically identifies both Patriot, Inc., and America's Trust as companies which the lenders must "bar ... from further participation in the [reverse mortgage] program."

## III

The plaintiffs appear to be likely to succeed on their claim that HUD's March 17, 1997 letter constitutes a rule requiring notice and comment procedures pursuant to the APA. HUD argues that the Mortgagee Letter is not a substantive rule, but either a policy statement or an interpretive rule, both of which Congress has exempted from the notice and comment requirement. 5 U.S.C. § 553(b)(A). Two criteria distinguish policy statements or interpretive rules from substantive rules. First, an agency action is not a substantive rule if it does not have a present binding effect, that is, if "it does not impose any rights and obligations." *American Bus Ass'n v. United States,* 627 F.2d 525, 529 (D.C.Cir.1980). Second, an action is not a rule if it genuinely leaves the agency and its decision-makers free to exercise discretion. *Id.*

The Mortgagee Letter has the binding effect of terminating Patriot's business in the reverse mortgage market, by canceling the 279 pending loans referred by Patriot and by barring Patriot from referring any clients to lenders in the future. The Letter expressly provides that "[t]his new policy is designed to halt any business dealings you have with these non-lenders in making HUD reverse mortgages." Mortgagees are warned that if they continue dealing with plaintiffs, "HUD WILL TAKE ACTION TO WITHDRAW THE FHA APPROVAL OF LENDERS THAT ENGAGE IN SUCH PRACTICES."

---

**1.** Neither HUD nor Fannie Mae filed any written opposition to plaintiffs' motion for a temporary restraining order.

The Mortgagee Letter does not permit HUD or its decision-makers to exercise their discretion on a loan-by-loan basis. Instead, the Letter effectively freezes all pending loans referred by plaintiffs but not yet completed, and bars plaintiffs from having any role in the reverse mortgage market in the future.[2]

The case at bar is factually quite similar to *Housing Study Group v. Kemp,* 736 F.Supp. 321 (D.D.C.1990), *order clarified,* 739 F.Supp. 633 (D.D.C.1990), in which the Court held that the same agency, using the same type of "letter" (addressed to co-insurers, rather than lenders), had impermissibly engaged in substantive rulemaking without conforming to the notice and comment requirements of the APA. The Court held that, by mandating HUD review and approval of coinsurance lenders, thereby replacing a system in which coinsuring lenders had autonomy to make commitments for such loans, HUD had "create[d] substantive rules which vastly change[d] the standard operating procedures of the coinsurance program." *Housing Study Group v. Kemp,* 732 F.Supp. 180, 185 (D.D.C.1990). Accordingly, the Court issued a preliminary and a permanent injunction enjoining HUD from enforcing these coinsuring lender letters. Apparently HUD has not learned the lesson of *Housing Study Group v. Kemp,* but the Court will instruct it again: HUD is not free to ignore the requirements of the APA in its haste to address perceived problems in the realm of national housing policy, whether it be massive defaults by coinsuring lenders or fees charged for assistance in obtaining reverse mortgages.[3]

To evade the requirement of notice and comment, HUD revives another argument, also discredited in the coinsurance lending case, that HUD's action is exempt from the APA's rulemaking requirement because it involved "agency management or personnel or ... public property, loans, grants, benefits or contracts." 5 U.S.C. § 553(a)(2). However, HUD has promulgated regulations establishing a "policy ... to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits or contracts even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1. Therefore, whether or not the APA's notice and comment requirement is applicable, HUD has nevertheless violated its own policy of undertaking notice and comment before it issues substantive rules.

## IV

In the absence of injunctive relief, plaintiffs will suffer irreparable harm. If HUD is not enjoined from enforcing the terms of the March 17 letter, plaintiffs will suffer economic harm in not being reimbursed for their assistance in obtaining hundreds of loans. The caselaw makes it clear that "economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas v. FERC,* 758 F.2d 669, 674 (D.C.Cir. 1985). However, economic harm rises to the level of irreparable harm where it threatens the "very existence of [plaintiffs'] business," *id.,* the situation in this case. Unless an injunction is granted, plaintiffs will be barred from the reverse mortgage market. Moreover, plaintiffs have demonstrated irreparable harm in damage to their business reputation. *See Honeywell, Inc. v. Consumer Product Safety Com'n,* 582 F.Supp. 1072, 1078 (D.D.C.1984). Plaintiffs' reputation will be damaged by HUD's characterization of them in the March 17 letter as "enticing" senior citizens into meetings, and "pressuring" them to obtain reverse mortgages "under the guise of sound estate planning."

The issuance of a preliminary injunction will not harm other interested parties in the reverse mortgage process, such as the spon-

---

2. By contrast, where the Secretary of Labor retained discretion to supersede "guidelines" on when to cite independent contractors for violations of safety standards in particular cases, these guidelines were held to be statements of policy. *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 538 (D.C.Cir.1986).

3. Because the Court finds that the March 17 Letter is a rule with binding effect, HUD's argument that it is merely an interpretation of existing regulations is similarly unpersuasive.

sors, TransAmerica and Wendover, the FHA-approved lenders, or the senior citizens who retain Patriot's services. Any senior citizen who does not wish to continue its relationship with Patriot may simply terminate the relationship because Patriot's service fee agreements are terminable by the client at any time prior to the client receiving funds from a reverse mortgage loan.

## V

Finally, the public interest is best served by having federal agencies comply with the requirements of federal law, particularly the notice and comment requirements of the APA, and the agency's own stated polices. *Housing Study Group v. Kemp*, 732 F.Supp. 180, 187 (D.D.C.1990). Here, HUD's actions violate both the APA, 5 U.S.C. § 553, and its own regulations, 24 C.F.R. § 10.1. Although the public interest would not be served by having senior citizens pay large fees for services available for free elsewhere, it appears from affidavits of plaintiffs' clients that many senior citizens have been unable to obtain information about reverse mortgages through sources other than Patriot. For example, one client wrote:

> I could not have figured out how to get a reverse mortgage loan without [plaintiffs' representative]. I had tried to obtain information before about reverse mortgages from several sources including banks, mortgage companies, escrow offices, *and acquaintances of mine who work for HUD.* The information provided by Mr. Butler and his company is simply not available in the real world, especially for seniors who are out of the mainstream.

Plaintiffs' Response Brief, Exhib. 4 (Harlin Aff. ¶ 4) (emphasis added). Another client, a childless widow who had tried to obtain a loan or information about a loan at a bank, a lawyer's office, and a senior center, but was never informed about reverse mortgages, saw plaintiffs' representative as "like an angel, showing up when she did." Plaintiffs' Response Brief, Exhib. 5 (Ree Aff. ¶ 6).

By the Mortgagee Letter, HUD sought to drive Patriot out of business for charging excessive fees. Certainly, if HUD had made its counseling sessions and advertisements for its home equity conversion mortgage program more accessible to senior citizens, the market would have ratcheted down plaintiffs' fees, if not driven them out of business entirely. HUD officials claim that they intended to protect those senior citizens, a laudable intent, but they have done so in the wrong manner.

After proceeding with the public participation required by HUD's own policy, HUD may well conclude that Patriot and other so-called "estate planning" services really have taken advantage of vulnerable senior citizens and operated at the margins of the law. At this point, it is debatable whether the public interest is better served when citizens are able to access the reverse mortgage market at a cost of 8.5% of the amount of the loan, or when citizens have no access to that market at all because of a lack of information. That is a decision best made after the type of public notice and comment from many interested and knowledgeable parties that HUD avoided by issuing a peremptory letter.[4]

## VI

Fannie Mae has moved to dismiss the sole claim against it pursuant to F.R. Civ. P. 12(b)(6). Plaintiffs claim that Fannie Mae is obligated by an implied contract to purchase all reverse mortgages obtained through the assistance of plaintiffs. However, as Fannie Mae's counsel correctly points out, there are several deficiencies in this argument. Most fundamentally, "mere expectancy of a continued course of conduct is not enough, even in situations where the disappointment of expectations results in a heavy financial loss." *Tauber v. Jacobson*, 293 A.2d 861, 867 (D.C.1972). In addition, plaintiffs have not demonstrated an offer, acceptance, or consideration—all essential elements of a contract which are required to succeed on an implied contract claim. *Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C.

---

4. HUD did have some input from outside sources, but, inasmuch as HUD flouted the Federal Advisory Committee Act, 5 U.S.C.App. § 1 *et* *seq.,* it lacked the balanced participation that provides confidence in accurate decision-making.

1993). Nor can plaintiffs demonstrate contractual privity because Fannie Mae does not deal directly with plaintiffs; rather, plaintiffs interact with borrowers who obtain loans from third-party lenders from whom Fannie Mae repurchases the mortgage. Finally, plaintiffs argue that because no rule or regulation precludes Fannie Mae from purchasing loans referred by plaintiffs, Fannie Mae is required to continue purchasing such loans. The Court refuses to indulge in such illogical reasoning.

■ Even if Fannie Mae's guides required plaintiffs to continue to purchase reverse mortgage loans on the secondary market—which they do not—such guides would not be enforceable because Fannie Mae is not a government agency. The cases cited by plaintiffs are inapposite because they involve the obligation of government agencies, or a federally-owned executive branch agency such as the United States Postal Service, to follow their regulations. Fannie Mae's legal status is not analogous to the Postal Service. Fannie Mae is a "private corporation," 12 U.S.C. § 1716b, owned by its private shareholders, and as a private entity, it does not issue regulations.

Plaintiffs are unlikely to succeed on their implied claim against Fannie Mae, and the Court therefore need not reach the remaining elements for issuance of an injunction against Fannie Mae. It is clear that a preliminary injunction is unwarranted, and plaintiffs' claim against Fannie Mae must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

ORDERED that plaintiffs' motion for a preliminary injunction be and it is hereby granted as to defendant HUD; and it is further

ORDERED that defendant HUD be and it is hereby enjoined from implementing or enforcing the terms of the March 17, 1997 Mortgagee Letter pending further order of the Court; and it is further

ORDERED that defendant Fannie Mae's motion to dismiss be and it is hereby GRANTED.