239 P.3d 602 (2010)
Dorothy ("Dottie") L. BROWN, by and through her guardian Joyce M. RICHARDS, Appellant,
v.
Barry Edward BROWN, Defendant,
Beverly Ann Hogg, and Wells Fargo Bank, National Association, a foreign corporation, Respondents.
No. 63207-8-I.
Court of Appeals of Washington, Division 1.
August 23, 2010.
Publication Ordered October 10, 2010.
*604 Lucy R. Clifthorne, Attorney at Law, Tacoma, WA, for Appellant.
Beverly Hogg, Pro Se, Federal Way, WA, for Respondent.
Ronald Edward Beard, Andrew Gordon Yates, David Christopher Spellman, Lane Powell PC, Seattle, WA, for Respondents, Wells Fargo Bank Nat'l Assn.
LAU, J.
¶ 1 Acting under a power of attorney signed by his 93-year-old mother, Dottie Brown, Barry Brown obtained and then misappropriated proceeds from a reverse mortgage on her condominium. Dottie's guardian[1] sued Barry,[2] his girl friend Beverly Hogg, and Wells Fargo Bank to recover the proceeds. Dottie appeals the summary judgment dismissal of her federal reverse mortgage law and Consumer Protection Act (CPA) claims against Wells Fargo Bank. She also appeals the summary judgment dismissal of her misappropriation and conversion claims against Hogg. Because Dottie presented insufficient evidence to create a genuine material fact issue regarding Wells Fargo's liability, the trial court properly dismissed Dottie's claims against Wells Fargo on summary judgment. But because material issues of fact exist regarding Hogg's liability for conversion, we reverse the summary judgment order granted in Hogg's favor. We affirm in part and reverse in part.

FACTS AND PROCEDURAL HISTORY
¶ 2 Viewed in the light most favorable to Dottie, the record reveals the following facts. Barry assumed primary responsibility for Dottie's health care and financial affairs. He testified that sometime in 2003 or 2004, Dottie arranged for them to meet with a "representative *605 of a reverse mortgage company"[3] who "explained the whole thing about the reverse mortgage and what you had to do to qualify and this and that."[4] About two years later, on February 1, 2006, Barry called Wells Fargo and talked to an employee, who completed a reverse mortgage application based on information supplied by Barry over the telephone. The application names Dottie as the borrower and identifies the subject property as her condominium located in Federal Way, Washington. Barry is shown as the "alternative contact person." And in response to the question "Do you intend to occupy the property as your primary residence?" the application indicates, "Yes."
¶ 3 That same day, Wells Fargo sent a letter and a copy of the recently completed reverse mortgage application to Dottie "c/o Mr. Barry Brown" at Barry's home address.[5] The letter informed Dottie that she "must obtain credit counseling from one of the agencies referenced in the attached letter." The letter also included an additional action item that requested, "Power of Attorneyif you are using in conjunction with this loan (must be durable)."
¶ 4 On February 15, Hogg drove Dottie and Barry to a United Parcel Service (UPS) store where Dottiethen 93 years old signed two powers of attorney (POA) appointing Barry as her attorney-in-fact. The immediately effective durable general power of attorney (general POA) gave Barry the right to "mortgage ... lands ... upon such terms and conditions, and under such covenants as [he] shall think fit" and provided, "This power of attorney shall not be affected by the disability of the principal and shall otherwise become null and void upon death." And the durable power of attorney (durable POA)[6] took effect "upon the disability or incompetence of the principal" and included the power to "[l]ease, sell, convey, exchange, mortgage and release any mortgage on lands and any interest therein." Both POAs were notarized by UPS employee Ashley Scott, who certified Dottie signed the POAs as her "free and voluntary act...." Scott further testified,
Because of my training and my understanding of the duties of a notary public, I would not have notarized either of ... the powers of attorney had the Principal, Ms. Dottie Brown, appeared in any way to be incompetent or otherwise unable to understand the documents she was signing.
Two witnesses to Dottie signing the durable POA stated under oath,

Principal's Competency. I believe that at the time of the Principal's previously-mentioned signing and request, the Principal was of sound mind and was not acting under duress, menace, fraud, undue influence, or misrepresentation.
¶ 5 The same day she signed the POAs, Dottie and Barry met with a Federal Way Wells Fargo employee to complete a mandatory "Face to Face Certification" and presentation of identification for the reverse mortgage application. Barry also faxed the general POA to Consumer Counseling Northwest, a HUD[7]-approved agency that provides mandatory reverse mortgage credit counseling. The following day, Barry completed credit counseling as his mother's attorney-in-fact. Wells Fargo received Barry's signed credit counseling certificate on February 24. Br. of Respondent at 9 (citing CP 954).
¶ 6 Two days earlier, on February 22, Dottie suffered a stroke that caused aphasia and neurological disorder. The record shows, and the parties do not dispute, the stroke *606 rendered her mentally incompetent. Three days after the stroke, she was discharged to a long-term care facility.
¶ 7 Meanwhile, Barry continued to pursue closing the reverse mortgage. He sent Wells Fargo the durable POA to establish his authority to act as Dottie's attorney-in-fact due to her incompetence. On April 1, he also submitted a letter from Dottie's orthopedic surgeon, Dr. Michael Franceschina, to confirm her cerebral vascular stroke and aphasia diagnosis. This letter also described Dottie's "difficulty communicating due to the aphasia." A Wells Fargo mortgage loan processor then sent a fax to Dr. Franceschina's office requesting additional information about Dottie's aphasia diagnosis and mental competency.
This is in response to the doctor's letter provided to Wells Fargo Bank, NA by Dr. Michael Franceschina for Dottie Brown. My underwriter has reviewed the letter and has questions.
1) When did Ms. Brown develop Expressive Aphasia?
2) Ms. Brown signed the Power of Attorney February 15, 2006. Please clarify if she was competent at that time to sign a Power of Attorney.
We need this information to determine whether or not a Power of Attorney will be needed at the time of signing.
But Dr. Franceschina declined to provide the additional information, citing his lack of medical expertise, to express an opinion on Dottie's mental competency. However, a note in Wells Fargo's underwriting file concludes, "Per Ginny MillerDr. letter and Definition is enough to verify that borrower is incompetent regardless of time frame."
¶ 8 At closing on April 25, Barry signed the deeds of trust securing the loan under the durable POA grant of authority. Hogg also attended the closing with Barry. The deed covenant required Dottie to live in the condominium as her primary residence.[8] Barry also signed an occupancy affidavit. It provided in part,
I/We hereby acknowledge and understand that I am executing this Statement of Occupancy which provides that if my loan application on the above described property is approved, I will occupy the same as my principal residence within sixty (60) days of the loan closing.
....
I further confirm my understanding and agreement that if I fail to occupy the property as my principal residence as provided above, such failure shall constitute a default under the terms and conditions of my loan, and upon the occurrence of such default, the whole sum of principal and interest shall immediately become due and payable at the option of the holder of my Note.
¶ 9 After the loan closed, Barry deposited approximately $198,000 in loan proceeds into a joint account shared with his mother. He transferred $20,000 to Hogg's personal bank account from this account. This lawsuit ensued to recover the proceeds.
¶ 10 In May 2008, Dottie moved for summary judgment against Barry and Hogg on her conversion and breach of fiduciary duty claims. Hogg successfully cross-moved for summary judgment dismissal, arguing that she had no knowledge that Barry had "interfered" with Dottie's property and that any sums she received were not identifiable. In June, the court denied without prejudice Dottie's summary judgment motion against Barry and granted his third party complaint against Wells Fargo. In October, Dottie amended her complaint to allege misappropriation, conversion, federal reverse mortgage law violations, and unfair or deceptive trade practice claims against Wells Fargo.
¶ 11 On November 14, Dottie moved for summary judgment against Wells Fargo and Barry, arguing that they converted her assets, Barry breached his fiduciary duties to her, and Wells Fargo violated federal reverse mortgage laws. Wells Fargo cross-moved for summary judgment dismissal against Dottie and Barry. The court (1) granted Wells Fargo's summary judgment dismissal motion against Dottie and Barry, (2) denied *607 Dottie's summary judgment motion against Wells Fargo, and (3) granted Dottie's unopposed summary judgment motion against Barry. On January 7, 2009, the court entered final judgment against Barry for $289,571.89, including interest, costs, and statutory fees.[9] Dottie appeals the summary judgment dismissal of her claims against Wells Fargo and Hogg.

ANALYSIS

Standard of Review
¶ 12 When reviewing an order granting summary judgment, we engage in the same inquiry as the trial court, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. Jones v. Allstate Ins. Co., 146 Wash.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Jones, 146 Wash.2d at 300-01, 45 P.3d 1068. "A material fact is one upon which the outcome of the litigation depends in whole or in part." Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wash.2d 506, 516, 799 P.2d 250 (1990) (citing Morris v. McNicol, 83 Wash.2d 491, 494, 519 P.2d 7 (1974)).

Claims Against Wells Fargo[10]
¶ 13 Dottie's liability claims against Wells Fargo rest on three assertions(1) Wells Fargo failed to verify that Dottie had received mandatory third party credit counseling under 12 U.S.C. section 1715z-20, (2) Wells Fargo improperly approved the reverse mortgage because Dottie was not living in the encumbered property as required by section 1715z-20, and (3) Wells Fargo's section 1715z-20 violations and its improper reliance on the durable POA constitute CPA violations.[11]

1. Violations of Section 1715z-20

¶ 14 We do not address Dottie's section 1715z-20 claims because section 1715z-20 creates no express or implied private right of action for damages.
¶ 15 The reverse mortgage program, section 1715z-20, "was established by Congress in 1988 to enable elderly homeowners to convert equity in their homes into a supplemental income stream." Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev., 963 F.Supp. 1, 3 (D.D.C., 1997) (citing 12 U.S.C. § 1715z-20(a)). Nothing in section 1715z-20 expressly creates a private right of action for reverse mortgage holders against their mortgagees for violations of that statute. Accordingly, Dottie must show that section 1715z-20 creates an implied cause of action entitling her to relief. See Birkholm v. Wash. Mut. Bank, F.A., 447 F.Supp.2d 1158, 1162 (W.D.Wash., 2006) (citing Suter v. Artist M., 503 U.S. 347, 363-64, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992)) ("The burden of demonstrating Congressional intent to create an implied right of action lies with the party asserting an implied right of action.").
¶ 16 To determine if a statute creates a private right of action, we look to the statutory section for "`rights-creating' language."[12]Alexander v. Sandoval, 532 U.S. 275, 288, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). This inquiry "simply require[s] a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries." Gonzaga Univ. v. Doe, 536 U.S. 273, 285, 122 S.Ct. 2268, 2276, 153 L.Ed.2d 309 (2002).
*608 ¶ 17 Section 1715z-20 contains no "rights-creating" language. Dottie alleges Wells Fargo failed to verify that she received third party credit counseling and that she lived in the encumbered property as a primary residence. But the counseling stipulation is a requirement for a mortgage "[t]o be eligible for [mortgage] insurance under this section."[13] Section 1715z-20(d). Thus, the only consequence for failure to comply with that provision is ineligibility for federal mortgage insurance. Similarly, the primary residence requirement appears in a section authorizing the HUD secretary to insure mortgages if certain requirements are met. This section creates no rights on behalf of private mortgagors.
(m) Authority to insure home purchase mortgage
(1) In general
Notwithstanding any other provision of this section, the Secretary may insure, upon application by a mortgagee, a home equity conversion mortgage upon such terms and conditions as the Secretary may prescribe, when the home equity conversion mortgage will be used to purchase a 1- to 4-family dwelling unit, one unit of which the mortgagor will occupy as a primary residence, and to provide for any future payments to the mortgagor, based on available equity, as authorized under subsection (d)(9).
Section 1715z-20(m) (emphasis added). And no other section clearly contains private "rights-creating" language. Dottie also cites no statutory language or case law that supports an implied private right of action based on § 1715z-20.[14] Because 12 U.S.C. section 1715z-20 creates no express or implied private right of action, the trial court properly dismissed Dottie's claims alleging federal reverse mortgage law violations.

2. Consumer Protection Act

¶ 18 To prevail in a private action based on a CPA violation, a party must establish five elements: (1) an unfair or deceptive act or practice (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff's business or property, and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 780, 719 P.2d 531 (1986). A plaintiff must make a prima facie showing of all five elements in order to survive summary judgment. Griffith v. Centex Real Estate Corp., 93 Wash.App. 202, 214, 969 P.2d 486 (1998). Failure to meet one of these elements is fatal to the claim. Hangman Ridge, 105 Wash.2d at 793, 719 P.2d 531.
¶ 19 To establish the first element, a plaintiff "need not show that the act in question was intended to deceive, but that the alleged act had the capacity to deceive a substantial portion of the public."[15]Hangman Ridge, 105 Wash.2d at 785, 719 P.2d 531. We review whether particular actions are deceptive as a matter of law. Stephens v. Omni Ins. Co., 138 Wash.App. 151, 166, 159 P.3d 10 (2007). To support her CPA claim, Dottie argues that Barry's withdrawal of "almost all the equity from [Dottie's] home" and "Wells Fargo's complicity in allowing him to do so, to its own profit, was an unfair or deceptive act under Washington's CPA." Br. of Appellant at 17. Dottie also alleges that Wells Fargo "accepted at face value that Dottie was competent when she signed a power of attorney form." Br. of Appellant at 12. But even viewing these *609 contentions as true,[16] Dottie fails to explain how Wells Fargo's alleged complicity "had the capacity to deceive a substantial portion of the public." Hangman Ridge, 105 Wash.2d at 785, 719 P.2d 531.
¶ 20 In Burns v. McClinton, 135 Wash. App. 285, 290-91, 143 P.3d 630 (2006), an investor sued his accountant, McClinton, for unauthorized fee increases, alleging multiple theories, including a CPA claim. We reversed a trial court award of attorney fees, treble damages, and an injunction under the CPA, in part because there was no evidence of the "capacity to deceive a substantial portion of the public" element. We reasoned,
[T]he record lacks evidence that any of McClinton's other clients were deceived. The evidence supporting the trial court's assertion that McClinton failed to disclose fee increases to other clients is virtually nonexistent. No testimony or documents identified other specific clients served by McClinton.
McClinton, 135 Wash.App. at 305, 143 P.3d 630.
¶ 21 Like McClinton, the record shows no evidence that Wells Fargo relied on questionable POAs or neglected to verify residency and third party credit counseling when dealing with other reverse mortgage applicants. Dottie correctly acknowledges the state of this record"Although there was no evidence presented as to other consumers injured by the bank's lending practices, the actions at issue are likely to affect or to have affected other consumers in like circumstances."[17] (Emphasis added.) Reply Br. of Appellant at 18. But "[m]ere speculation that an alleged unfair or deceptive act had the capacity to deceive a substantial portion of the public is insufficient to survive summary judgment" on a CPA claim. Westview Invs., Ltd. v. U.S. Bank Nat'l Ass'n, 133 Wash.App. 835, 854 n. 27, 138 P.3d 638 (2006) (citing Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP, 110 Wash. App. 412, 40 P.3d 1206 (2002)). And Dottie's admission that she presented no evidence that Wells Fargo's actions have the capacity to deceive a large portion of the public defeats her CPA claim. See Hangman Ridge, 105 Wash.2d at 793, 719 P.2d 531 (failure to meet any one of the CPA elements is fatal to the claim).
¶ 22 Wells Fargo also argues that Dottie cannot establish the public interest impact and causation elements. Because we conclude that Dottie's CPA claim fails on the first element, we need not address the remaining elements. See McClinton, 135 Wash.App. at 306, 143 P.3d 630.

Conversion Claim Against Hogg
¶ 24 Dottie next argues that the court erred in dismissing her claim for conversion against Hogg because material fact issues exist regarding liability.[18] Despite Hogg's inadequate pro se appellate brief, she maintained below that she was the innocent recipient of $20,000 and this money satisfied Barry's indebtedness to her.
¶ 24 Conversion is "`the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it.'" Consulting Overseas Mgmt., Ltd. v. Shtikel, 105 Wash.App. 80, 83, 18 P.3d 1144 (2001) (quoting Wash. State Bank v. Medalia Healthcare, LLC, 96 Wash.App. 547, 554, 984 P.2d 1041 (1999)); Davenport v. Wash. Educ. Ass'n, 147 Wash.App. 704, 722, 197 P.3d 686 (2008). "Money may become the subject of conversion, but only if the party charged with conversion wrongfully received the money, or if that party had an obligation to *610 return the money to the party claiming it." Consulting Overseas, 105 Wash.App. at 83, 18 P.3d 1144. Furthermore,
"[t]here is nothing in the nature of money making it an improper subject of [conversion] so long as it is capable of being identified, as when delivered at one time, by one act and in one mass, or when the deposit is special and the identical money is to be kept for the party making the deposit, or when wrongful possession of such property is obtained."
Westview Invs., 133 Wash.App. at 852, 138 P.3d 638 (quoting Davin v. Dowling, 146 Wash. 137, 140-41, 262 P. 123 (1927)).
¶ 25 Wrongful intent is not an element of conversion, and good faith is not a defense. Paris Am. Corp. v. McCausland, 52 Wash. App. 434, 443, 759 P.2d 1210 (1988). "`"Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action [in conversion]."'" In re Marriage of Langham & Kolde, 153 Wash.2d 553, 560, 106 P.3d 212 (2005) (alteration in original) (quoting Judkins v. Sadler-Mac Neil, 61 Wash.2d 1, 4, 376 P.2d 837 (1962)).
¶ 26 We conclude that Dottie has raised a material fact issue regarding Hogg's liability for conversion. Whether Hogg wrongfully received or retained the $20,000 reverse mortgage proceeds is a question of fact.[19]Consulting Overseas, 105 Wash.App. at 83, 18 P.3d 1144. Viewed in a light most favorable to Dottie, the record shows[20] that Hogg drove Dottie and Barry to the UPS store to sign the POAs on February 15, 2006. She also attended the reverse mortgage closing on April 25more than two months after Dottie suffered a stroke rendering her physically disabled and mentally incompetent. Six days later, on May 1, Wells Fargo transferred $150,080 to Dottie and Barry's joint bank account, which had a balance of $2,767.68 before the transfer. Barry then immediately transferred $150,000 to his personal bank account, which had an approximate balance of $9 before the transfer. That same day, he transferred $20,000 from his account to Hogg's personal bank account. Hogg's account balance was $491 before this transfer. The durable POA specifically prohibited Barry from "mak[ing] any gifts of [the Principal's] property during the Principal's lifetime, except as provided in Paragraph[s] 4.10[[21]] and 4.14[[22]] above." And Hogg acknowledged below that previous gifts from Dottie were "only small gifts like chocolate for Valentine's Day." While Hogg claims the $20,000 she got from Barry satisfied debts he owed her, the record on this point is unclear. Finally, the purpose for reverse mortgage proceeds is to "meet[ ] health, housing, and subsistence needs" of the mortgagor. Section 1715z-20(a)(1). On this record, a jury could reasonably infer that Hogg knew Barry misappropriated Dottie's money (a fact Barry did not dispute below) and improperly transferred $20,000 of it to Hogg. And her receipt and retention of the $20,000 was therefore "wrongful."
¶ 27 Hogg also argued below that "[k]nowledge that there was a previous interference with the property must be present in the converter for liability to attach. Hogg cannot be secondarily liable when she had no knowledge whatsoever about the previous property, which was not identifiable."[23] But *611 "[p]roof of the defendants' knowledge or intent are not essential in establishing a conversion." Judkins, 61 Wash.2d 1, 3, 376 P.2d 837 (1962); see also Langham & Kolde, 153 Wash.2d at 560, 106 P.3d 212 (citing Judkins, 61 Wash.2d at 4, 376 P.2d 837). And "[i]f the actor has the intent to do the act exercising dominion or control ... he is not relieved from liability by his mistaken belief that he has possession of the chattel or the right to possession, or that he is privileged to act." RESTATEMENT (SECOND) OF TORTS § 223, cmt. (b) (1965). On this record, reasonable minds could differ over whether Hogg's retention of the $20,000 constitutes an intentional and wrongful exercise of dominion and control over it.[24] And Hogg cites no authority that her knowledge of Barry's prior interference is required to establish conversion.
¶ 28 As we concluded above, there are material issues of fact pertaining to Hogg's liability for conversion. But even if we assume, without deciding, "knowledge that there was a previous interference with the property" is required to establish a conversion claim, Hogg's credibility about when and what she knew relating to Barry's misappropriation of Dottie's loan proceeds weighs in favor of denying summary judgment.[25] "[W]here material facts are particularly within the knowledge of the moving party ... "`it is advisable that the cause proceed to trial in order that the opponent may be allowed to disprove such facts by cross-examination and by the demeanor of the moving party while testifying."'" Riley v. Andres, 107 Wash.App. 391, 395, 27 P.3d 618 (2001) (quoting Mich. Nat'l Bank v. Olson, 44 Wash.App. 898, 905, 723 P.2d 438 (1986)).
¶ 29 We affirm summary judgment dismissal as to Wells Fargo but reverse summary judgment dismissal as to Hogg and remand for further proceedings consistent with this opinion.
WE CONCUR: APPELWICK and BECKER, JJ.
NOTES
[1] Joyce M. Richards filed the lawsuit in her capacity as Dottie's court-appointed guardian. And for clarity we use Barry and Dottie's first names.
[2] We do not consider Barry's response brief because he did not file a timely appeal.
[3] The record does not indicate the company's name.
[4] Under a reverse mortgage, "instead of the mortgagor (homeowner) making payments to the mortgagee (lender), the mortgagee makes payments to the mortgagor" in order to "enable elderly homeowners to convert equity in their homes into a supplemental income stream." Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev., 963 F.Supp. 1, 3 (D.D.C., 1997) (citing 12 U.S.C. § 1715z-20(a))
[5] The record shows Wells Fargo never mailed the letter or application to Dottie's Federal Way address.
[6] Wells Fargo refers to the general power of attorney as "non springing" and the durable power of attorney as "springing."
[7] United States Department of Housing and Urban Development.
[8] Our review of the record shows no evidence that Barry notified Wells Fargo about Dottie's permanent admission to the long-term care facility.
[9] Criminal charges are pending against Barry but are not at issue in this appeal.
[10] Dottie's reply brief asserts that Wells Fargo is also liable for converting her assets. But "[a]n issue raised and argued for the first time in a reply brief is too late to warrant consideration." Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992).
[11] In a related argument, Dottie also maintains that Wells Fargo improperly accepted the loan application from Barry on February 1, 2006 two weeks before she signed the POAs.
[12] Earlier cases rely on four factors established in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). But "the Supreme Court has gradually receded from its reliance on three of these four factors, focusing exclusively on legislative intent to create a private right of action as the touchstone of its analysis." Love v. Delta Air Lines, 310 F.3d 1347, 1351-52 (11th Cir.2002).
[13] Section 1715z-20(f) also sets out requirements for "[t]he Secretary [to] provide or cause to be provided adequate counseling for the mortgagor, as described in subsection (d)(2)(B)."
[14] Dottie also cites to 24 C.F.R. section 206.41(a) and 12 C.F.R. section 226.33(a) requirements for independent credit counseling and primary residence. But those provisions also lack "rights-creating" language. And Dottie offers no rationale or controlling case authority for implying a private right of action based on those regulations.
[15] A plaintiff can also satisfy the first element by showing that the alleged act constitutes a per se unfair trade practice. "A per se unfair trade practice exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated." Hangman Ridge, 105 Wash.2d at 786, 719 P.2d 531; see also Anderson v. Valley Quality Homes, Inc., 84 Wash.App. 511, 515-16, 928 P.2d 1143 (1997). Dottie fails to establish that Wells Fargo's acts violated a statute that the legislature has declared to constitute an unfair or deceptive act.
[16] And our review of the record shows no evidence to support Dottie's "complicity" theory.
[17] Although Dottie makes this acknowledgement in her discussion of the third CPA element, it is relevant to our analysis here.
[18] Dottie also argues that Hogg breached a fiduciary duty owed to Dottie. But Dottie's complaint does not allege a cause of action for breach of fiduciary duty against Hogg. And although Dottie moved for summary judgment against Hogg on breach of fiduciary duty, her only argument on that claim consists of one sentence: "Defendants' conduct was a breach of the position of trust that both parties had assumed with respect to Dottie when they assumed responsibility for her medical care and management of her financial affairs." Accordingly, we decline to consider Dottie's breach of fiduciary duty argument.
[19] Dottie also argues that Hogg is liable for conversion because Barry made purchases on Hogg's behalf using Dottie's credit card. But the record is unclear as to which funds he used to pay those charges and money may be the subject of a conversion claim only where it is identifiable. See Westview Invs., 133 Wash.App. at 852, 138 P.3d 638.
[20] It is undisputed that Barry and Hogg had a long-term, romantic relationship. They also cohabitated periodically and even lived for a time with Dottie.
[21] Paragraph 4.10 allows for gifts to "continue a pattern of charitable contributions or individual financial support which the Principal has established... while competent...." But Hogg acknowledges that Dottie had no pattern of providing her gifts or financial support beyond "small gifts like chocolate for Valentine's Day."
[22] Paragraph 4.14 allows "the Attorney-in-Fact... to make gifts of the principal's assets to himself without breach of fiduciary duty," but does not allow gifts to others.
[23] When Barry transferred $20,000 to Hogg, a substantial portion of this money was identifiable. Before Wells Fargo transferred any loan proceeds, the balance in Dottie and Barry's joint account was $2,767.68. And the balance in Barry's personal checking account was $9. Therefore, even assuming that Barry used non-equity funds first, he transferred $17,223.32 of Dottie's identifiable loan proceeds to Hogg.
[24] Hogg withdrew $1,000 in cash on the day she received the $20,000, wrote a check for $821.50 the following day, and one for $197.14 on May 8.
[25] The record reveals no other witnesses other than Barry and Hogg with personal knowledge about Hogg's knowledge. And Barry's Fifth Amendment privilege may foreclose his testimony on issues related to Hogg's liability.