# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BRIAN JENNINGS, an individual; GREEN COLLAR CANNABIS, LLC, a Washington limited liability company; GCC ENTERPRISES, LLC, a Washington limited liability company; and J&B ATM SERVICES, LLC, a Washington limited liability company, | No. 55966-8-II |
| Respondents, | |
| v. | |
| JERIMIAH RASMUSSEN, an individual, also known as JEREMIAH RASMUSSEN, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.—Brian Jennings bought an interest in Green Collar Cannabis LLC in 2016. Jennings and Jerimiah Rasmussen were the only members of Green Collar. Green Collar's operating agreement stated that dishonest acts against the company, including embezzlement, would result in forfeiture of a member's ownership units.

Rasmussen tried to remove Jennings from the company because Jennings bought part of a competing store. Jennings sued Rasmussen and asked for a preliminary injunction to stop Rasmussen from financially harming Jennings or Green Collar. Shortly before a trial court granted the injunction and appointed a receiver to manage Green Collar, Rasmussen transferred $600,000 out of Green Collar's accounts. Rasmussen later removed approximately $102,000 in cash from Green Collar's safe and eventually returned only part of this money.

The trial court found Rasmussen in contempt three times for violating the injunction and refusing to tell the receiver where the $600,000 was or to return the money. The trial court found that Rasmussen had embezzled the cash from the safe and converted the $600,000. The trial court entered a judgment against Rasmussen for the $600,000.

The trial court then granted Jennings partial summary judgment, concluding that Rasmussen's conversion of the $600,000 and embezzlement of cash from the safe were dishonest acts that violated Green Collar's operating agreement. Therefore, Rasmussen forfeited his membership shares. The trial court also denied Rasmussen's motion to remove the receiver.

Rasmussen appeals from the trial court's final judgment. He argues the trial court erred by finding that he converted the $600,000, by granting partial summary judgment on forfeiture, and by denying his motion to remove the receiver.

We affirm. Substantial evidence supported the finding that Rasmussen converted the $600,000, there was no genuine issue of material fact as to whether he forfeited his shares by violating the operating agreement, and there was no good cause to remove the receiver.

FACTS

I. BACKGROUND

In 2016, Jennings bought an interest in Green Collar from Rasmussen's former business partners. Jennings and Rasmussen signed an operating agreement for Green Collar in June 2016. They were the only members of the limited liability company, which operated a single cannabis retail store in Tacoma. Rasmussen owned 51 percent of Green Collar and Jennings owned 49 percent.

The Green Collar operating agreement required cooperation between the members. It provided that in the event of a disagreement, the members had to "meet and confer," and that "[a]ll Members shall have an opportunity to be fully heard regarding the management decision and disagreement." Clerk's Papers (CP) at 21. The operating agreement required *unanimous* approval by the members for any member to borrow funds from the company, "[c]hange the amount of Members' monthly draws," sell or dispose of Green Collar's assets outside the usual course of business, or "[c]onstruct any improvements or make any capital improvements, repairs, alterations, or changes in or to the Company's property involving in any instance an expenditure in excess of $75,000." CP at 21-22. Similarly, the agreement allowed a member to conduct business with the company if "approved in advance" by the members on a case-by-case basis. CP at 22, 25.

> Another section limited the members from competing within two miles of the store:
>
> Nothing in this Agreement will be deemed to restrict in any way the freedom of any member to conduct any other business or activity whatsoever without any accountability to the Company or any Member, provided however that if such investments or activities compete with the business of the Company they do not do so within a two-mile radius of the Company's principal place of business.

CP at 24. The operating agreement did not identify a specific consequence for conducting a competitive business within two miles.

The operating agreement prohibited the members from acting against the interest of the company. Section 5.6 prohibited dishonest acts: "Should any Member perpetrate any act of dishonesty, such as fraud or embezzlement, against the Company, the Member who committed said fraudulent acts shall forfeit his or her Units to the Company to be distributed pro rata among the remaining Members." *Id*. The operating agreement also required members to "account for all funds as fiduciaries" and stated that any company funds held by a member must be "held in trust

for the benefit of the Company and must not be [comingled] with other funds of a Member," "not be the personal property of a Member," and, "to the maximum extent permitted by law, not be vulnerable to inclusion in the bankruptcy estate of a Member." CP at 27.

## II. INITIAL PROCEEDINGS AND PRELIMINARY INJUNCTION

Rasmussen initially tried to limit Jennings's involvement with Green Collar, then cut off Jennings's access to Green Collar's business records and stopped his tax distributions and member draws in late 2018. In December 2018, Jennings and Green Collar sued Rasmussen for breach of fiduciary duty, conversion, unjust enrichment, and violation of disclosure requirements, among other claims. Jennings argued that Rasmussen had tried to unilaterally terminate Jennings from Green Collar and then used the company's assets for Rasmussen's personal gain "in violation of the express provisions of the LLC Agreement, and absent Mr. Jennings's consent." CP at 4. He alleged that Rasmussen violated several provisions of the operating agreement, including the prohibitions on borrowing money or self-dealing without member approval.

In June 2019, Jennings moved to amend his complaint to add a cause of action for breach of the Green Collar operating agreement. Jennings alleged Rasmussen breached the operating agreement by "unilaterally refusing to compensate Mr. Jennings or make required member distributions," "unilaterally diverting company assets to advance his own separate business," "denying Mr. Jennings access to the business and accounting records," and "improperly advancing litigation expenses from the company to himself." CP at 1796. The trial court granted the motion to amend the complaint.

The same day, Jennings moved to appoint a receiver to manage Green Collar during the lawsuit and for a preliminary injunction to bar Rasmussen from taking any action that would injure

Jennings or Green Collar. The trial court appointed John Munding as receiver because of Green Collar's "unique situation in that the two members who are fighting with each other are the only members, and there can be no consensus unless they are unanimous." Verbatim Report of Proceedings (VRP) (June 28, 2019) at 39. Thus, the trial court feared the company would not "survive through the pendency of this litigation unless a third party steps in and has oversight." *Id*.

The trial court also granted the preliminary injunction, barring Rasmussen from "selling, transferring, or dissipating Green Collar Cannabis, LLC assets to any third party," from denying Jennings access to the store, and from "[m]aking any operational or managerial decision" without conferring with Jennings. CP at 160. The injunction required Rasmussen to provide all information reasonably necessary for Munding to perform his duties as receiver. The state liquor and cannabis board also approved Munding to serve as a receiver for Green Collar.

III. CONTEMPT FINDINGS AND JUDGMENT FOR $600,000

A.     Motion to Dissolve Injunction and First Contempt Finding

Only a few weeks later, Rasmussen moved to dissolve the preliminary injunction and appoint a substitute receiver, alleging that Munding's receivership was damaging Green Collar and was a pretense for a hostile takeover of the company.

In response, Jennings moved to find Rasmussen in contempt based on failure to comply with the injunction and receivership order. Jennings stated that he visited the bank to check on the company's accounts three days after the injunction and learned that just before the injunction was entered, Rasmussen "made a series of transactions, including a $200,000 withdrawal," without Jennings's consent, which was "not consistent with [Green Collar's] normal course of business, as no account or provider requires payment in such sums." CP at 206. Rasmussen transferred the

money from Green Collar's account to an account for GCC Enterprises, a different company Rasmussen owned, and then wrote a $200,000 check to another company he owned, Disrupter LLC, with "advertising" in the memo line. CP at 728. Rasmussen also wrote a check for $400,000 to himself with "Loan to Shareholder" in the memo line the day before the injunction was entered. CP at 237. And Rasmussen made several transactions with Green Collar's debit card after the injunction was entered.

In late July 2019, Jennings moved to file a second amended complaint, seeking a declaratory judgment that Rasmussen had forfeited his membership units in Green Collar and two other companies jointly owned by the parties by perpetrating dishonest acts against the companies. The trial court granted the motion to amend. In his answer, Rasmussen filed eight counterclaims against Jennings and Green Collar and five claims against third party defendants. His counterclaims included claims for anticompetitive business practices because Jennings bought an interest in a competing business and a claim for abuse of process based on Munding's receivership.

The trial court denied Rasmussen's motion to dissolve the injunction and appoint a substitute receiver, stating that it believed the receivership was "absolutely necessary to protect and preserve the company." VRP (July 12, 2019) at 43. And it found Rasmussen in contempt for the debit card transactions that occurred after the injunction. The trial court emphasized, "That is not to say that Mr. Munding cannot continue investigating the approximate $600,000 that went missing immediately prior to the hearing. That may indeed be litigated in the future." *Id*. at 44. The trial court ordered Rasmussen to return the money he had taken unless Jennings and Munding gave him permission to keep it.

6

B.    Second Contempt Finding

Munding terminated Rasmussen as an employee of Green Collar based on the unauthorized transfers of $600,000, his refusal to provide documentation or information about the money, and the contempt finding. Then, Munding moved to find Rasmussen in contempt of the injunction order for a second time. Munding explained that in addition to the $600,000 Rasmussen transferred just before the injunction, Munding had discovered that Rasmussen removed $102,623 in cash from Green Collar's safe soon after the injunction was entered. Witnesses saw Rasmussen remove the money, he was also caught on security video, and the money was not deposited into Green Collar's bank account. Munding received no response when he attempted to contact Rasmussen and his attorneys about the missing cash. And Munding still had not received the requested information about the $600,000. Because the missing money was impacting Green Collar's ability to pay its taxes and employees, Munding sought a contempt order giving Rasmussen five days to return the cash from the safe.

At a hearing on the motion, Rasmussen's counsel, who was new to the case, stated that Rasmussen told him that he had given Munding information about the missing $600,000 and returned the cash from the safe. Munding refuted these assertions, clarifying that he had received a bank receipt for a deposit of approximately $24,000 that may have been part of the missing cash. Rasmussen had also sent him "a shareholder loan and repayment agreement that was apparently drafted and signed by Mr. Rasmussen to Mr. Rasmussen" which was not a sufficient explanation for the whereabouts of the $600,000. VRP (Sept. 20, 2019) at 13. The shareholder loan and repayment agreement was dated June 24, 2019, just before the injunction was entered, authorizing

a transfer of $600,000. Rasmussen signed as both the lender and borrower, and the document was witnessed by his wife and stepson.

The trial court found that Rasmussen violated the injunction order "by converting, embezzling, and wrongfully misappropriating" the cash taken from the safe and not returned. CP at 337. The trial court found that Rasmussen's transfers of the $600,000 were "not made in accordance with the [Green Collar] governing documents." CP at 338. The trial court granted the second motion for contempt, ordering Rasmussen to return the cash from the safe within five days. And if Rasmussen did not inform Munding of "the location and identity of all persons and entities in possession" of the $600,000 within five days, the trial court authorized Munding to seek a judgment against Rasmussen for $600,000. CP at 339-40.

C.      Third Contempt Finding, Motion to Turn Over Estate Property, and Judgment

The next month, Munding moved for an order to either direct Rasmussen to immediately return the still-missing $600,000 or enter a judgment against Rasmussen for $600,000. Jennings joined the motion. Munding disputed Rasmussen's continued insistence that the loan agreement was sufficient authority for the transfers.

Munding explained that he traced the $600,000 to an escrow account with a title company, then to AJ Lending, a limited liability company managed by Rasmussen's stepson. Munding stated that Green Collar needed the missing money to pay its taxes. To avoid future damage to Green Collar, he sought an order under RCW 7.60.070, which allows a receiver to demand turnover of estate property, requiring Rasmussen to return the $600,000 to Green Collar.

Rasmussen responded that Jennings had forfeited his membership in Green Collar, giving Rasmussen the authority to take the money, which he claimed to be using to buy the store property.

Rasmussen argued that he had unilateral authority to control Green Collar's funds because he had decided that Jennings forfeited his membership units by purchasing an interest in another cannabis store. Rasmussen contended that this violated section 5.4 of the operating agreement, which prohibited competition within two miles of Green Collar's store. The store Jennings invested in is more than two miles from Green Collar. And the operating agreement does not impose any specific consequences for violating the anticompetition provision. Finally, there is no evidence in our record of any adjudication that Jennings forfeited his membership units in Green Collar.

Munding countered that Rasmussen's assertion about Jennings's alleged forfeiture was a "legal conclusion, without any foundation or evidence . . . . unsupported as a matter of fact and law, [and] in direct contradiction of this Court'[s] prior order" finding that the transfers were unauthorized. CP at 457. And he argued that the trial court's prior rulings established that the $600,000 was estate property that Rasmussen transferred without authority and that Munding was entitled to demand the return of the money.

The trial court found Rasmussen in contempt for a third time. The trial court found that "there is no bona fide dispute as to [Green Collar's] ownership of the $600,000 taken and converted from [Green Collar's] Timberland Bank account by Defendant Rasmussen." CP at 487. It found that Rasmussen's actions "were and remain disobedient of this Court's Orders and the Receiver's demands for turnover." *Id*. And it found that Green Collar was "the rightful owner of the $600,000" and "entitle[d] to turnover and possession of the $600,000." *Id*. The trial court ordered Rasmussen to return the $600,000 to Munding within five days. It also authorized Munding to seek entry of a judgment for $600,000 if Rasmussen did not return the money within five days.

Ten days later, Munding moved for entry of judgment against Rasmussen for the $600,000. Munding included a finding in the proposed judgment that Rasmussen converted the $600,000. Munding argued that the finding was proper:

> [T]hat language actually tracks the two prior [contempt] orders and is very important to the receivership estate under federal law 11 U.S.C [§] 523.86, which is a bankruptcy code provision that says, willful conversion of property is not dischargeable, and that's what we had here.
> So what I'm doing is protecting the estate. It's also consistent with the prior findings. Nothing has been supplemented or added that this court has not already determined as a matter of law.

VRP (Dec. 6, 2019) at 4. Rasmussen's counsel then stated, "For those purposes of the bankruptcy law, we will not object to the order, Your Honor." *Id*.

The trial court entered judgment for Green Collar against Rasmussen for "willful and wrongful conversion of [Green Collar's] property," with a principal judgment of $600,000 plus prejudgment interest, attorney fees, and remedial sanctions. CP at 539.

Rasmussen moved for reconsideration of the judgment. In response, Munding offered e-mails and a deposition from the bookkeeper who drafted the shareholder loan and repayment agreement Rasmussen used to justify the transfer of the $600,000, indicating that the document was not drafted until after the injunction had been entered. The trial court denied the motion for reconsideration.

IV. PARTIAL SUMMARY JUDGMENT AND MOTION TO REMOVE RECEIVER

A.      Partial Summary Judgment on Forfeiture

Jennings moved for partial summary judgment, relying on facts that the trial court found in the contempt proceedings. Jennings sought a determination that Rasmussen had forfeited his membership interest in Green Collar by converting the $600,000 and embezzling the roughly

$77,000 taken from the safe that had not been returned. He argued that Green Collar's operating agreement "unambiguously requires such forfeiture when a party commits such acts of dishonesty." CP at 525. Munding joined the motion.

In response, Rasmussen justified his loan to himself by stating that he believed Jennings had forfeited his member units because "[i]n December 2018, Rasmussen held a members' meeting, which Jennings did not attend," leaving Rasmussen the sole member of the company. CP at 598. Rasmussen contended there was an issue of material fact "as to whether there was fraud or dishonesty and whether [Jennings] had already forfeited his member units." CP at 599. He again posited that Jennings had forfeited his membership units by investing in another cannabis business. He also insisted that judicial estoppel barred Jennings from arguing that Rasmussen's acts constituted conversion, because Munding sought the conversion language solely to avoid discharge in bankruptcy.

The trial court granted the motion for partial summary judgment. It restated prior findings that Rasmussen embezzled $102,623 from Green Collar's safe and converted $600,000 via unauthorized transfers. It concluded, "Rasmussen's acts of embezzlement and conversion of [Green Collar] property constitute acts of dishonesty committed against [Green Collar] as defined by Paragraph 5.6 of the [Green Collar] Operating Agreement." CP at 981. It also concluded that Rasmussen's conduct required "the forfeiture of Rasmussen's Membership Units to [Green Collar] as provided for and directed by the [Green Collar] Operating Agreement." *Id*. The trial court ordered Rasmussen's membership units forfeited to Green Collar.

11

B.      Motion to Remove Munding as Receiver

Rasmussen moved to remove Munding as receiver, arguing that Munding was improperly acting as cocounsel for Green Collar because he filed a notice of appearance on behalf of Green Collar and joined Jennings's motion for partial summary judgment.

Munding objected to the motion, explaining that he was an officer of the court who had performed his duties in accordance with the trial court's orders, the laws governing receiverships, and Green Collar's best interests. His notice of appearance specified that he joined the proceedings "'as counsel for the Receiver and the [Green Collar] Receivership Estate,'" and was filed so that he would receive proper electronic service of filings in the case, similar to a guardian ad litem. CP at 804. And he stated that he joined the motion for partial summary judgment because the forfeiture of Rasmussen's membership units would fall within the purview of his management of Green Collar. Jennings also opposed the motion to remove Munding.

The trial court denied the motion to remove Munding as receiver. It found no evidence that Munding exhibited bias against Rasmussen and that Munding properly entered a notice of appearance on behalf of the receivership estate. The trial court found that joining the motion for partial summary judgment "was proper and falls within the Receiver's authority to manage and protect the assets and interests of [Green Collar]." CP at 985. The trial court further explained that it did not believe RCW 7.60.035, which controls who can be a receiver, applied to exclude Munding from being a receiver in the case. The trial court stated that Munding's notice of appearance and advocacy were "fully consistent with the Receiver's obligations to [Green Collar] and to the Court, and in no way are they in contravention of the legislative purpose behind RCW

7.60.035." CP at 985-86. It stated that Munding "remain[ed] impartial and unbiased while carrying out his duties." CP at 986.

## V. LATER PROCEEDINGS

The trial court later dismissed Rasmussen's counterclaims for anticompetitive business practices and abuse of process. Because Rasmussen failed to turn over the $600,000 to Munding, the trial court on its own motion found Rasmussen in contempt and eventually incarcerated him until he returned the money. He was released several days later when he delivered the funds to Green Collar's bank account.

The trial court later granted Munding's motion to wind up the receivership estate and discharge Munding as receiver, returning control of the assets to Green Collar and Jennings.

After Rasmussen was sanctioned for discovery violations several times, the trial court dismissed the rest of his counterclaims with prejudice. Jennings moved for entry of the sanctions as a final judgment. The trial court entered a final judgment. Rasmussen appeals the final judgment.

## ANALYSIS

### I. CONTEMPT ORDER AND JUDGMENT FINDING CONVERSION

Rasmussen argues that the trial court erred by entering judgment against him for conversion of $600,000. He contends that he instead "withdrew the funds as a loan." Appellant's Opening Br. at 13. "Even if the loan was improper . . . it cannot be classified as a form of embezzlement or theft . . . . [because t]here was never an intent to steal or lie about the fact that he was indeed taking the money." *Id*. at 14-15. We disagree.

The trial court found that Rasmussen had converted the $600,000. Rasmussen assigns error only to the finding in the judgment, but that judgment was based on previous orders, including the

finding of conversion in the third contempt order. It is clear that Rasmussen challenges the finding that he converted the $600,000 in the contempt order, so we review that finding. *See State v. Olson*, 126 Wn.2d 315, 322, 893 P.2d 629 (1995).

We review a trial court's challenged findings of fact to determine if they are supported by substantial evidence in the record, which is "evidence that is sufficient 'to persuade a rational, fair-minded person of the truth of the finding.'" *Blackburn v. Dep't of Soc. & Health Servs.*, 186 Wn.2d 250, 256, 375 P.3d 1076 (2016) (internal quotation marks omitted) (quoting *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 353, 172 P.3d 688 (2007)). "If the standard is satisfied, a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently." *Sunnyside Valley Irr. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003).

Conversion requires "willful interference with chattel," "by either taking or unlawful retention," which deprives the owner of possession. *Burton v. City of Spokane*, 16 Wn. App. 2d 769, 773, 482 P.3d 968 (2021). "'Wrongful intent is not an element of conversion, and good faith is not a defense.'" *Id.* (quoting *Brown ex rel. Richards v. Brown*, 157 Wn. App. 803, 818, 239 P.3d 602 (2010)). "A bailee who, on demand, refuses to return property to its owner is liable for conversion." *Id.*

RCW 7.60.080(1) states that upon request from the receiver, an owner of property subject to a receivership shall "[a]ssist and cooperate fully with the receiver in the administration of the estate and the discharge of the receiver's duties, and comply with all orders of the court." Further, the person should, "[u]pon the receiver's appointment, deliver into the receiver's possession all of the property of the estate in the person's possession, custody, or control, including, but not limited

to, all accounts, books, papers, records, and other documents." RCW 7.60.080(3). And RCW 7.60.070 explains that, upon a demand from the receiver, a person whose property is subject to a receivership "shall turn over any property over which the receiver has been appointed that is within the possession or control of that person." A receiver may move "to compel turnover of estate property unless there exists a bona fide dispute with respect to the existence or nature of the receiver's interest in the property." RCW 7.60.070.

As receiver for Green Collar, Munding had authority to request the return of the $600,000 as property of the estate. RCW 7.60.070. Rasmussen had a statutory obligation to cooperate, as well as a fiduciary obligation under the operating agreement to hold any funds "in trust for the benefit of the Company," not comingle Green Collar funds with his own assets, and "to the maximum extent permitted by law," not let Green Collar funds "be vulnerable to inclusion in [his] bankruptcy estate." CP at 27; *see also* RCW 7.60.080(1). The trial court found that "there is no bona fide dispute as to [Green Collar's] ownership of the $600,000 taken and converted from [Green Collar's] Timberland Bank account by Defendant Rasmussen." CP at 487.

Munding traced the $600,000 through several entities to a limited liability company in Rasmussen's stepson's name that was created two months after Rasmussen transferred the funds out of Green Collar's account. Rasmussen repeatedly refused to provide information on the whereabouts of the money, merely asserting that he had properly loaned the funds to himself to purchase the property Green Collar's store was located on, even though at least $200,000 of the money was initially marked for "advertising." CP at 728. This argument, which he maintains on appeal, ignores that the operating agreement required unanimous member approval before a member could borrow money from Green Collar. The fact that the money was eventually found in

possession of a company operated by Rasmussen's stepson also indicates a possible violation of the operating agreement provision requiring member approval before any member could deal with the company. Further, on reconsideration, Munding offered evidence that the shareholder loan and repayment agreement that Rasmussen used to justify taking the money was drafted several days after the transfers, then backdated to several days before the injunction.

Rasmussen's claim of good faith is not a defense to conversion, especially in light of Munding's repeated requests and the trial court's order for him to return the money to Green Collar. *Burton*, 16 Wn. App. 2d at 773. There was substantial evidence to support a finding that Rasmussen willfully interfered with funds that belonged to Green Collar, that he unlawfully retained those funds after multiple valid requests from Munding and court orders to return them, and that this deprived Green Collar of possession. Thus, there was substantial evidence to support a finding of conversion, and it was not error for the trial court to enter judgment against Rasmussen on this basis.

## II. PARTIAL SUMMARY JUDGMENT

Rasmussen argues that the trial court erred by granting partial summary judgment concluding that he forfeited his share in Green Collar. He contends that there was an issue of material fact whether he converted the $600,000. He also appears to argue that the trial court did not have "full, clear and strict proof of the legal right" to order forfeiture of his member units.[1] Appellant's Opening Br. at 21. He further contends that judicial estoppel bars any finding of conversion because Munding's statement that converted property cannot be discharged in

---

[1] We note that Rasmussen sought a partial summary judgment ruling that Jennings forfeited his membership units by acquiring an interest in another cannabis store more than two miles away from Green Collar's principal place of business.

bankruptcy is contrary to Jennings's present position. And he insists that "the question of whether Jennings had already forfeited his member units was never answered or even investigated by the Receiver." *Id.* at 20. Rasmussen maintains that he properly removed Jennings from the company before the $600,000 loan occurred. He does not challenge the trial court's finding that he embezzled the money he took from Green Collar's safe and failed to return.

Jennings responds that the trial court properly granted partial summary judgment because the trial court had already found Rasmussen converted and embezzled roughly $677,000 from Green Collar in violation of the operating agreement. He contends that the trial court had authority under the operating agreement to rule that Rasmussen forfeited his membership units. He also argues that judicial estoppel does not apply because his counsel did not make any inconsistent statement. Finally, Jennings emphasizes that there is no record or court ruling showing that he forfeited his interest in the company and that Rasmussen made multiple sworn statements admitting that Jennings had a membership interest in Green Collar after Rasmussen claims that Jennings forfeited his shares.

As a preliminary matter, Jennings is correct that judicial estoppel does not apply to Munding's statement that converted property cannot be discharged in bankruptcy proceedings. Judicial estoppel applies when a party's later statement is clearly inconsistent with its previous position, judicial acceptance of the inconsistent position would create the perception that one of the courts was misled, and the party asserting the inconsistent position would derive an unfair advantage from acceptance of the position. *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 539, 160 P.3d 13 (2007). Neither Jennings nor his counsel made the statement Rasmussen now relies upon, Munding's statement is not inconsistent with Jennings's position that Rasmussen's behavior

constituted conversion and embezzlement, and Jennings does not derive an unfair advantage from our acceptance of either position.

We review a trial court's grant of summary judgment de novo, performing the same inquiry as the trial court. *Landstar Inway, Inc. v. Samrow*, 181 Wn. App. 109, 120, 325 P.3d 327 (2014). RCW 7.24.010 authorizes courts to issue declaratory judgments. And any person with an interest in a "written contract or other writings constituting a contract," whose rights are affected by that document, may seek a judicial "declaration of rights, status or other legal relations thereunder." RCW 7.24.020. As a signatory to Green Collar's operating agreement, Jennings is a person with interest in and with rights affected by the operating agreement, and he could seek a judicial determination that Rasmussen forfeited his membership shares of the company.

Section 5.6 of Green Collar's operating agreement provided that if a member perpetrates "any act of dishonesty, such as fraud or embezzlement, against the Company, the Member who committed said fraudulent acts shall forfeit his or her Units to the Company to be distributed pro rata among the remaining Members." CP at 24. The trial court found in prior contempt proceedings that Rasmussen both embezzled and converted property from Green Collar, and the trial court concluded on summary judgment that these acts triggered forfeiture of his shares under the operating agreement.

Embezzlement "'occurs where property that is lawfully in the taker's possession is fraudulently or unlawfully appropriated by the taker.'" *In re Disciplinary Proceeding Against Schwimmer*, 153 Wn.2d 752, 760-61, 108 P.3d 761 (2005) (quoting *State v. Ager,* 128 Wn.2d 85, 91, 904 P.2d 715 (1995)). "Unlike theft by taking, embezzlement involves a violation of trust and

does not require proof of intent to permanently deprive the owner of the property taken." *Ager*, 128 Wn.2d at 91.

Rasmussen does not challenge the trial court's finding that he embezzled roughly $77,000 from Green Collar's safe and that this was a dishonest act. This was a separate finding from the finding that Rasmussen converted the $600,000. Even construing the facts in the light most favorable to Rasmussen, Rasmussen was caught on video removing $102,623 from Green Collar's safe and only returned approximately $24,000. It is not apparent from our record whether the remaining cash was ever recovered. Embezzlement is specifically identified in Green Collar's operating agreement as a dishonest act that will trigger forfeiture. There is no genuine issue of material fact whether Rasmussen forfeited his membership shares by embezzling cash from Green Collar's safe.

The trial court also found that Rasmussen converted the $600,000. Rasmussen justifies the taking of the $600,000 by asserting that he was using the money to buy the property Green Collar's store sat on. As discussed above, there was substantial evidence to support the trial court's repeated findings that Rasmussen converted the $600,000. And he does not dispute that he defied a court order to return the $600,000 to the receiver for many months, *after* the trial court found no bona fide dispute that Green Collar was entitled to demand turnover of the money. *Compare* CP at 485-88 (order for Rasmussen to return the $600,000 within five days entered Nov. 15, 2019), *with* CP at 2616 (order discharging Rasmussen from incarceration once he purged contempt by returning the $600,000, entered June 2, 2020). Because Munding had the authority to request the return of the $600,000 to Green Collar and Rasmussen refused to comply, there is no genuine issue of material fact whether Rasmussen converted the $600,000. *Burton*, 16 Wn. App. 2d at 773. We

agree with the trial court that conversion is a dishonest act as contemplated by section 5.6 of the operating agreement. Thus, there is no genuine issue of material fact that Rasmussen forfeited his membership shares by embezzling cash from Green Collar's safe and converting $600,000 from Green Collar's bank account.

We affirm the order granting partial summary judgment regarding forfeiture.

### III. MOTION TO REMOVE RECEIVER MUNDING

Rasmussen argues that the trial court erred when it found no good cause to remove Munding as receiver. He contends that Munding was biased against him because he did not investigate Jennings's minority ownership in a competing cannabis store that was outside the two-mile noncompeting radius. And Rasmussen believes Munding exceeded the scope of his appointment by joining Jennings's motion for partial summary judgment. We disagree.

RCW 7.60.035 allows anyone to serve as a receiver except for parties to the action, people "convicted of a felony or other crime involving moral turpitude," county sheriffs, or anyone with "an interest materially adverse to the interest of persons to be affected by the receivership generally." And RCW 7.60.060(1)(c) gives a receiver significant authority to pursue court action with regard to their assigned property. RCW 7.60.280(1) allows for the removal or replacement of a receiver only if the receiver fails to execute a bond, "resigns or refuses or fails to serve for any reason, or for other good cause." We view the "good cause" standard as similar to the standard for removing the personal representative of an estate: to do so, the "superior court must have valid grounds for removal and these grounds must be supported in the record." *See In re Est. of Jones*, 152 Wn.2d 1, 10, 93 P.3d 147 (2004). "Without such grounds, removal would constitute an abuse of discretion." *Id*. at 10 n.2.

The receivership has ended, so this court cannot provide any effective relief. To the extent that Rasmussen's allegations of bias also allegedly undermine the validity of Munding's acts as receiver, the trial court found that RCW 7.60.035 did not apply to bar his appointment, and there is no evidence that Munding was unfit to be appointed receiver under RCW 7.60.035. The trial court found no evidence that Munding was biased against Rasmussen, and it found that his notice of appearance on behalf of the Green Collar estate was in compliance with its own order appointing Munding as receiver. Further, Munding's duties to the estate included protecting Green Collar's assets from inclusion in Rasmussen's bankruptcy estate. And the trial court found that Munding's joinder of the motion for partial summary judgment "was proper and falls within the Receiver's authority to manage and protect" Green Collar's assets and interests. CP at 985. Munding's notice of appearance was "fully consistent with the Receiver's obligations to [Green Collar] and to the Court." CP at 985-86. The trial court found that Munding was "impartial and unbiased while carrying out his duties." CP at 986. Rasmussen does not assign error to any of these findings, so they are verities on appeal. *Real Carriage Door Co. ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955, *review denied*, 198 Wn.2d 1025 (2021). And there is nothing in our record that indicates that Munding exceeded the scope of his authority under RCW 7.60.060 or any of the trial court's orders. The trial court properly denied Rasmussen's motion to remove Munding as receiver.

We affirm.

No. 55966-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Glasgow, CJ_____
Glasgow, C.J.

We concur:

_J, J_____
Lee, J.

_Cruser, J._____
Cruser, J.

22